BRIGHAM (TAYLOR v.). See Case No. 13,-781.

---

## Case No. 1,875.

### BRIGHT v. BOYD.

[1 Story, 478.][1]

Circuit Court, D. Maine. May Term, 1841.

EXECUTORS AND ADMINISTRATORS — SALES UNDER ORDER OF COURT — TAXATION — SALE FOR NONPAYMENT — REDEMPTION — INJUNCTION—AIDING LEGAL PROCEEDINGS—SALES—DEFECTIVE TITLE —BONA FIDE PURCHASERS—IMPROVEMENTS.

1. Where an administrator, not having previously given the proper bond, with sureties, and had it approved by the judge of probate, sold certain real estate, it was held, that the bond was a necessary prerequisite to such a sale, and, it not having been given, the sale was void. Whether the omission was accidental or not, it could not be treated as a mistake or accident remediable in a court of equity.

[Cited in Carr v. Gale, Case No. 2,435.]

2. Although courts of equity may afford relief against the defective execution of a power executed by a party, yet they cannot afford relief against the defective execution of a power created by law. Nor can they dispense with all the necessary formalities; but there may be exceptions to this rule.

3. Where certain real estate was sold for the taxes, and subsequently passed through various persons by intermediate conveyances, it was held, that the right of redemption was against the very person possessed of the title at the time of the redemption. The tax title having been purchased, while the suit was pending, it was held, that a title so obtained did not, by the local decisions, constitute any defence to the action of law. Yet relief will be granted by way of injunction in equity, where the tenant has, pendente lite, acquired a title paramount to that of the demandant, if he cannot avail himself of it as a defence to the original suit at law, or cannot, after recovery, maintain an action to regain the possession. The statute of Maine of the 27th of June, 1820, c. 47, commonly called the "Betterment Act," applies only where the tenant has been in actual possession of the land for six years or more before the action brought, by virtue of a possession and improvement, which term had not in this case elapsed, when the writ of entry was brought.

4. Quaere, whether the maxim "qui tacet, consentire videtur; qui potest, et debet vetare, jubet, si non vetat," is applicable to minors, who stand by, and make no objection, and discover no adverse title, having a reasonable discretion, from their age, to understand and act on the subject; and whether the guardian is bound to disclose his ward's title, and how far the ward is bound by his silence or negligence, and whether there is any distinction between minors living within the state and without the state.

5. Where the owner of an estate, after a recovery thereof at law from a bona fide possessor for a valuable consideration without notice, seeks an account in equity, a plaintiff, against such possessor for the rent and profits, courts of equity will allow him to make a deduction therefrom of all the meliorations and improvements made beneficially by him on the estate, and thus to recoup them from the rents and profits. The same doctrine holds in cases, where the owner of an estate has only an equitable title thereto. The Roman law also allowed compensation for all beneficial expenditures, and if a bona fide holder of real estate paid money to discharge any existing incumbrance or charge upon it, without notice of the informality of his title, he was entitled to reimbursement, pro tanto.

[Cited in Williams v. Gibbes, 20 How. (61 U. S.) 538; Stark v. Starr, Case No. 13,-307; Kanawha Coal Co. v. Kanawha & Ohio Canal Co., Id. 7,606; Neff v. Pennoyer, Id. 10,085; Griswold v. Bragg, 48 Fed. 521; Canal Bank v. Hudson, 111 U. S. 83, 4 Sup. Ct. 312; Doe v. Roe, 31 Fed. 99; Davis v. Gaines, 104 U. S. 386.]

[In equity. Bill by John Bright against John W. Boyd for injunction and other relief. Interlocutory decree for plaintiff, and order of reference to a master.]

The bill stated in substance as follows: That on the 3d day of November, 1816, John P. Boyd was seised in fee of the southerly

---

[1] [Reported by William W. Story, Esq.]

part of lot No. 37, in Bangor, according to the survey and plan of the Settlers' Lots, made by Park Holland, in 1801. That John P. Boyd made his will on the third day of November, 1816, a copy of which is recited, and thereby bequeathed one quarter part of his estate to John Wallace Boyd, born in October, 1814, his natural son, &c. That John P. Boyd died on the 5th day of October, 1830, not having revoked his will. That on the 18th of October, 1830, E. L. Boyd proved the will in Boston, as one of the executors. On the 31st of May, 1831, he filed a copy of the said will in the probate court in Penobscot county, and administration with the will annexed, was granted to John Merrill of Portland, who gave bond, accepted the trust, and returned an inventory. The personal estate was not sufficient to pay the debts by $4,500.

It further stated, that John Merrill, on the 31st of October, 1831, petitioned for license to sell real estate to raise $4,500, and charges, which was granted on the 29th of November, 1831. That on the 28th of January, 1832, Merrill took the oath, and made and executed to William D. Williamson, judge of probate, &c., a bond, in due form of law, with two good and sufficient sureties in said bond named. That on the 19th and 26th of June, and 3d of July, 1832, Merrill caused advertisements of the time and place of sale to be published in the Eastern "Republican," according to the order of the court. On the 20th of July, 1832, the time of sale, the agent of Merrill was present, and adjourned the sale to August 1st, 1832, and advertised the said adjournment. That on the 1st day of August, 1832, Merrill, the administrator, sold the lot No. 37, also lot No. 36, (claimed by the said Boyd, but owned by the state of Maine,) to Allen Gilman, Joseph Treat, William Lowder, and Ebenezer French, for $1,474.87, the full value of the lots at the time of sale. That on the 2d of August, 1832, Merrill, as administrator, made a deed to the said persons, and on the 29th of August, acknowledged the same, and on the 1st of May, 1833, the deed was recorded in the registry of deeds, Penobscot county.

It further stated, that on the 24th April, 1833, Treat, French, and Lowder, for a valuable consideration, conveyed to the Penobscot Mill Dam Company, three fourths of the following described parcels of land, parts of lots 36 and 37, to wit, &c. containing 49 acres, more or less, being the front part of lots 36 and 37, meaning to convey all the land, between the then travelled road and the river. A. Gilman conveyed one fourth of lot 36 and 37 to Amos Davis. On the 19th of October, 1833, Amos Davis conveyed his one fourth to the Penobscot Mill Dam Company, by deed recorded April 25th, 1835. That, on the 10th of September, 1834, the Penobscot Mill Dam Company conveyed to John E. Marshall, by deed of that date, lot No. 30. And on the 6th of April, 1835, Mar-

shall conveyed the south half of the said lot to Mark Trafton. That on the 6th of April, 1835, Trafton conveyed the same to Sarah G. Marshall. That on the 25th of August, 1836, John E. and Sarah G. Marshall, conveyed to the plaintiff the said lot No. 30, together with the dwelling house and stable thereon standing. That on the 3d of April, 1837, the plaintiff conveyed to John E. Marshall lot No. 30 and buildings, by a deed of release and quitclaim. On the 3d day of April, 1837, Marshall conveyed the said lot No. 30, subject to a mortgage of John E. Marshall to Guy C. Cargill, to secure a note for $737.35 and interest in four days, dated September 14th, 1836.

It further stated, that at the time of the purchase by the plaintiff, (Bright,) he believed, that said Merrill had complied with the requirements of law, and was able to give a good title to lot No. 30. He also believed, that prior to advertising the sale of real estate, Merrill, the administrator, took the oath and gave a bond, as required by law, on the sale of real estate; that, before making the bond, Nathaniel Hatch, his agent, submitted the names of proposed sureties to the judge of probate, who said they would be satisfactory, and the bond was accordingly executed. That after the execution of the bond, and before advertising, Hatch, the agent, informed the said judge, that he had received the said bond, duly executed by the said Merrill, as principal, and Samuel E. Crocker and J. N. Merrill, as sureties, and that the said judge said he would approve the same. That the plaintiff has been informed and believes that through some accident the said bond was not filed in the probate office of Penobscot county, until after the sale of the said lot by the said Merrill, as aforementioned. That after the deed from Merrill, the administrator, to Treat and others, the persons under whom the plaintiff claims lot No. 30, confidently relying on the goodness and legality of their title under the deed of said Merrill, have expended large sums of money in improving the said lot, in erecting a large dwelling-house and stable thereon, and in causing other benefits to be done to the same, to the sum of $4,000, or thereabouts; and that the said lot No. 30, at the time of said sale, and now, had no improvements been made by the grantees of the said Merrill, or their assigns, would not have been worth more than at the rate of $12 per acre, and that the said lot contains only one fifth part of an acre or thereabouts. That the plaintiff believes, that the said Merrill, and his agents, acted honestly and fairly in the sale of the said estate.

The bill then goes on to state, that the plaintiff has been informed, and believes, that on the third day of December, 1831, the inhabitants of school district No. 4, in said Bangor, at a legal meeting, voted to raise the sum of $350 for the purpose of complet-

ing a schoolhouse in the said district; and that the assessors of Bangor, on the 3d day of January, 1832, assessed the said sums with overlayings on the said tax, being $13.56, upon the polls and estate of the inhabitants of said district, and upon the estate of persons not resident thereon. That the sum of $10 was assessed on lot No. 37, being within the limits of the said school district; and the assessors delivered a list of their assessments, together with a warrant for collection, to Newell Bran, collector of taxes of Bangor for 1831. That the said $10 not being paid, and the proprietors of lot No. 37 not living or resident in said district, the said collector duly advertised the said lot No. 37, for sale at auction at the tavern of Advardis Shaw, in said Bangor, on the 31st of July, 1832; and adjourned the sale to August 2d, when the said lot No. 37 was sold, to pay the said taxes and intervening charges, to William Thompson, the highest bidder, for $14. That Newell Bran, collector, on the 2d of August, 1832, conveyed the said lot to said William Thompson, subject to the statute redemption by proprietors, being five years. That the said lot No. 37 not being redeemed by the proprietors, William Thompson, on the 31st of July, 1837, conveyed the said lot to Gilman and others, and that the plaintiff claims to hold the said lot No. 30 under the said sale for taxes. That the plaintiff is informed, that the title to lot No. 30, acquired by the said Gilman and others, would enure to his benefit; but that the said title would not be a sufficient defence in a trial at law, to a suit instituted previous to the acquisition of that title. That the defendant, on the 11th of April, 1837, sued the plaintiff at the May term of the circuit court of the United States, for an undivided fourth of a certain tract of land, being the premises, which John E. Marshall conveyed to the plaintiff; and the said action was entered at the May term, and continued to the May term, 1838, when the defendant recovered judgment against the plaintiff for possession of the said one fourth of the said lot No. 30 and costs of suit.

The bill concludes with a prayer, that Boyd may be decreed to pay to Bright the full value in money of all the improvements upon the premises, demanded in the said writ, made by the plaintiff, and those under whom he claims, before the commencement of said suit, or release to the plaintiff all his right to the said premises, or that the plaintiff may have such further relief, as equity requires; also for an injunction or perpetual stay of execution, and for a subpoena.

The answer objects to the plaintiff's right to prosecute the bill, and excepts to the jurisdiction of the court; and goes on to state, that John P. Boyd died seised in fee of lots 36 and 37; that the state of Maine had no right or interest in said lot 36; that J. P. Boyd made his will, &c. as stated in the bill. It also denies, that the personal estate was insufficient to pay the just debts, which he owed at the time of his death. That the defendant has been informed and believes, that the debts due J. P. Boyd, at the time of his death, were more than sufficient to pay all the debts, which he owed at the time of his death, with incidental charges. That John Merrill was never legally authorized and licensed to sell the estate of J. P. Boyd, never took the oath and gave bond, nor gave notice or made sale, as the law requires, and that Merrill's proceedings were null and void, and no right or title passed thereby. That if the several deeds were made and executed, as is alleged in the plaintiff's bill, (of which the defendant has no knowledge, but denies and requires proof of it,) the same were illegal and void, and nothing passed thereby. It denies the conversation held with the judge of probate, and the observations or declarations ascribed to him; and states, that the defendant has been informed, that some improvements have recently been made on lot No. 30, but far short of the amount alleged in the said bill; and the value of the said lot, independent of the said improvements, is much greater than the amount set forth. It states that the buildings and improvements were made within six years next before the commencement of the defendant's action against the plaintiff, and that the said Bright, and those under whom he claims, had not had lot 30 in actual possession, for the term of six years next before the commencement of the said action; and the plaintiff has no right to claim or demand any compensation or allowance for such buildings and improvements, and this court has no right or authority to allow the same. That no tax was legally voted by the said school district, nor legally assessed on the said lot No. 37; that Bran had no right or authority to deed the said lot, and that he never did legally advertise and sell the said lot, nor make any legal conveyance thereof to Thompson, or any other person; and that all proceedings named in the said bill, relating to the said tax were illegal and void, and no right, title, or estate was conveyed thereby. But that the defendant, at the time of the pretended sale, to wit, on the 2d of August, 1832, being owner of the said lot 37, was a minor, residing in Boston, Massachusetts, and, by the laws of the state, he had eight years to redeem the land, which had not elapsed. That, notwithstanding the said sale was void, the defendant, not waiving his right, but to avoid litigation, did, on the 25th of April, 1839, and within eight years after the pretended sale, redeem the said lot by tender of the amount of taxes, charges, and interest, at 12 per cent., amounting in all to $—, which sum the defendant brings into court. That the defendant denies a sale or conveyance by Thompson to Gilman, Treat, Lowder, and French, and by them to Bright. That the defendant commenced his action against the

said Bright, to obtain his just rights, and pursued the same to judgment, and ought not longer to be deprived of the benefit of the said judgment, but to have a writ of possession, which he prays for, without further delay. It further states, that the defendant has no knowledge of the motives or exertions of Merrill, the administrator, or his agents, in fixing on the time and place for the sale of the said lands, and that all their proceedings in relation thereto are void; and that the price at which the said lands are alleged to have been sold, is far short of the value of that land; nor had Merrill, as he believes, given bond, &c., and that none was given till long after his pretended sale. That the defendant has no knowledge or information of the circumstances under which Bright purchased lot 30, or whether he knew of the legal defects and irregularity of the said Merrill's proceedings, but as they are matters of record, he is presumed to have been acquainted with them. That the defendant had no knowledge or information of any pretended assessment of a tax on the said lot, nor that any bills had been committed to the said Bran, nor that the said lot had been advertised or sold to the said Thompson before the commencement of the said action against the said Bright, nor until the trial of the said action.

The cause was set down for a hearing at this term, upon the bill, answer, and evidence, the general replication having been filed, and was argued by Preble and Hobbs, for plaintiff, and by Longfellow and Rogers, for defendant.

STORY, Circuit Justice, delivered the opinion of the court at the argument, and afterwards said: The opinion of the court was briefly stated at the argument, and an order passed accordingly. But I have since thought the whole subject deserved a fuller examination and statement; and have, therefore, since that time drawn up our views more at large. Two titles are set up in the bill, as grounds of relief. The first is, that the plaintiff claims, by intermediate conveyances, the land in controversy, under an administration sale, made for the payment of debts, by the administrator with the will annexed of John P. Boyd, the testator, under whose will the defendant claims title as his devisee, and in virtue thereof has recovered the premises in an action at law, against Bright (the plaintiff). It is admitted, that the administrator was duly licensed to make the sale, in 1832; and that he complied with all the requisites of law necessary to the validity of the sale, except that previous to the sale no bond with sureties was given by the administrator, for the faithful discharge of his duty to, and approved by the judge of probate. In point of fact, it seems that a bond with sureties was executed before the sale, and the names of the sureties were satisfactory to the judge of probate; but the bond was not approved by the judge or filed in the probate office until several years afterwards, in 1835. Upon this case coming out on the trial of the action at law, (a writ of entry,) the court held, that the giving of the bond was by law an essential prerequisite to the sale; and, it not having been complied with, the sale was consequently invalid, and passed no title to the purchaser. See Act Me. March 20, 1821, c. 51, § 68; Act Me. March 21, 1821, c. 52, § 2; Act Me. March 16, 1830, c. 470, § 6; 1 Laws Me. (Ed. 1821) pp. 223, 227; 3 Laws Me. (Ed. 1830) p. 315.

It is now argued, that however correct this doctrine may be at law, yet, in a court of equity, the omission to give the bond within the stipulated time, ought not to be held a fatal defect; but it should be treated as a mistake, or inadvertence, or accident, properly remediable in a court of equity. We do not think so. The mistake was a voluntary omission, or neglect of duty, and in no just sense an accident. But if it were otherwise, it would be difficult, in the present case, to sustain the argument. This is not the case of the defective execution of a power, created by the testator himself; but of a power, created and regulated by statute. Now, it is a well settled doctrine, that although courts of equity may relieve against the defective execution of a power, created by a party; yet they cannot relieve against the defective execution of a power, created by law, or dispense with any of the formalities required thereby for its due execution; for otherwise the whole policy of the legislative enactments might be overturned. 1 Story, Eq. Jur. (2d Ed.) §§ 96, 177. There may, perhaps, be exceptions to this rule; but if there be, the present case does not present any circumstances which ought to take it out of the general rule. 1 Story, Eq. Jur. (2d. Ed.) § 177, and note 1; 2 Chance, Powers, arts. 2985, 2987; Sugd. Powers (3d Ed.) p. 370; Lord Mansfield in Zouch v. Woolston, 2 Burrows, 1146; Earl of Darlington v. Pulteney, Cowp. 266, 267. Therefore, it seems to us, that the non-compliance with the statute prerequisites, in the present case, is equally fatal in equity, as it is in law.

Then, as to the tax title. It is admitted, that the sale of the land for the taxes, in August, 1832, was valid, and the title conferred thereby on the purchaser was good, subject to the statute right of redemption within five years, and, in case of minors, (in which predicament the defendant was at the time of the sale) of eight years. St. Me. March 12, 1831, c. 501; 3 Laws Me. 349. The land by intermediate conveyances under this sale became vested in Allen Gilman in 1837, (under whom the plaintiff claimed title to the premises by the administration sale); and the defendant within the eight years after the tax sale, to wit, in April, 1839, offered to redeem the same from Gilman, and to pay him the amount then claimed by him

under the tax sale. Gilman declined to receive payment, and waived any formal tender. So that, if the tender was made to the right party, the redemption was sufficiently claimed to entitle the defendant to reassert his original right. It has been suggested at the argument, that the tender ought not to have been made to Gilman, but to the original purchaser at the tax sale, or to the present plaintiff, Bright. We think otherwise; for upon the natural, and indeed almost necessary construction of the statute the right of redemption must be against the party, who is possessed of the tax title at the very time of the redemption; for such party alone is entitled to the redemption money, as holding the conditional estate; and a tender to any other person, in whom the title is no longer vested, would displace his rights, and might deprive him of the intervening charges, which had been incurred by him, for which he might justly claim a remuneration under the statute. Now, Gilman alone, possessed the tax title at the time of the supposed tender; and the plaintiff (Bright) has never received any conveyance thereof from Gilman; but, at most, he only claims by way of estoppel against Gilman, founded on the former conveyance of the administration title. Surely it is not for the owner to trace out and search for titles, originating collaterally, or by estoppel, before he is entitled to redeem. He can look only to the legal title, as it stands upon the public records of the country, under derivative conveyances from the purchaser. It has also been said, that the amount due was not ascertained, or tendered to Gilman. But the true answer is, that it was his duty at the time of the proffered tender to state the full amount, which he, or those, under whom he claimed, were entitled to; and, by waiving the tender, he waived any objection on this head.

There is another consideration, which bears upon the tax title. It was purchased pending the suit at law; and, by the local decisions, it has been established, that such a title, so obtained, cannot constitute any defence to the action at law. Thus, in Andrews v. Hooper, 13 Mass. 472, it was held, that a tenant in a real action cannot give in evidence a title, obtained by him since the commencement of the suit, by way of defence. The ground of the decision was, that a different course would operate unequally and unjustly by enabling the tenant to fortify a defective title, and avoid the payment of the costs of the action. I confess, as a new point, I should feel some difficulty in assenting to the doctrine upon such a ground; for it can hardly be said, that if the demandant has not a perfect title, there is either injustice or inequality in not allowing him to recover against a tenant, who at the very time of the trial is in possession under a higher or a better title. If the tenant has obtained a paramount title to the demandant, subsisting in a third person, what reason is

there, why he should be ousted of his possession by a demandant under an inferior and defective title? If the title is derived from and under the demandant himself, why should he be permitted to defeat the effect of that title? There may be good reason for saying, that an outstanding title in a third person, with whom the tenant has no privity, shall not be interposed to defeat a present, although inferior, title of the demandant. But, when there is a privity of title established in the tenant, it is not easy to see, why the tenant may not avail himself of it. It is by no means true, as a general proposition, that a defence, arising pendente lite, may not even at the common law be made effectual, as a defence to the suit. Pleas puis darrein continuance are of this sort. It was said by Lord Ellenborough in Le Bret v. Papillon, 4 East, 502, that no matter of defence, arising after action brought, can be properly pleaded in bar of the action generally. That is true; and yet it is equally true, that it may be pleaded against the further maintenance of the suit, as was established by the judgment of his lordship in that very case. Besides; what is the effect of the doctrine? Either a recovery in the action at law will operate as a bar to any future action, brought by the tenant against the demandant, founded upon the title so acquired pendente lite, which would certainly be most unjust and inconvenient, and has never, to my knowledge, been established as sound law; or, it will only turn the tenant round to a new writ of entry, to recover the premises from the demandant, after he shall have acquired possession under a writ of habere facias possessionem; a circuity of action, which certainly has nothing to recommend it, since it would only multiply costs. There is this additional consideration, which has no small weight; that, if the paramount or derivative title had its origin and existence before the suit was brought, it shows, that the demandant relies on an originally defective title; and that the real difficulty in the case is, not that the outstanding title ought not to be a bar, but that the tenant, until he has acquired a privity thereunto, is prohibited by technical principles from availing himself of it. There certainly are cases, in which a mere disseisor may avail himself of the defective title of the demandant, as a defence, although he may not connect himself with it. The case of Wellington v. Gale, 13 Mass. 483, 489, sufficiently establishes that. However, I do not mean to do more than to express my doubts, if the question were new. Considering it as a settled doctrine of local law, it is very clear, that relief ought to be granted by way of injunction in equity, where the tenant has, pendente lite, acquired a paramount title to that of the demandant, if he cannot avail himself of it, as a defence to the original suit at law; or, if he cannot after the recovery maintain an action to regain

the possession. In my opinion, the recovery would under such circumstances operate no bar to a future action at law by the tenant; and, therefore, no relief in equity would seem to be required, founded upon the title acquired pendente lite. But as the tax title in the present case, for the reasons already stated, never became absolute, the bill under any aspect of the case does not seem maintainable, so far as respects that title.

The case, then, resolves itself into the mere consideration, whether the plaintiff is entitled to any allowance for the improvements made by him, or by those, under whom he claims title, so far as those improvements have been permanently beneficial to the defendant, and have given an enhanced value to the estate. There is no doubt, that the plaintiff in the present bill is a bona fide purchaser for a valuable consideration, without notice of any defect in his title. Indeed, he seems to have had every reason to believe, that it was a valid and perfect title; and this, also, seems to have been the predicament of all the persons, who came in under the title by the administration sale; for it is not pretended, that any one of them had actual notice, that no bond was given to the judge of probate previous to the sale. And, indeed, all of them, including the purchaser at the sale, acted upon the entire confidence, that all the prerequisites, necessary to give validity to the sale, had been strictly complied with. The original purchaser was, if at all, affected only by the constructive notice, which put him upon inquiry, as to the facts necessary to perfect the right to sell. The statute of Maine of 27th of June, 1820, c. 47, commonly called the "Betterment Act," will not aid the plaintiff; for that statute applies only to cases, where the tenant has been in actual possession of the lands for six years or more, before the action brought, by virtue of a possession and improvement, which term had not elapsed, when this writ of entry was brought. So that, in fact, the whole reliance of the plaintiff must be upon the aid of a court of equity to decree an allowance to him for the improvements, made by him, and those, under whom he claims, upon its own independent principles of general justice.

Two views are presented for consideration. First, that the defendant has lain by, and allowed the improvements to be made, without giving any notice to the plaintiff, or to those, under whom he claims, of any defect in their title; which of itself constitutes a just ground of relief. Secondly, that if the defendant is not, by reason of his minority and residence in another state at the time, affected by this equity, as a case of constructive fraud or concealment of title; yet that as the improvements were made bona fide, and without notice of any defect of title, and have permanently enhanced the value of the lands, to the extent of such enhanced value the defendant is bound in conscience to make compensation to the plaintiff ex aequo et bono.

In regard to the first point, it has been well remarked by Sir William Grant (then master of the rolls) in Pilling v. Armitage, 12 Ves. 84, 85, "that there are different positions in the books with regard to the sort of equity, arising from laying out money upon another's estate through inadvertence or mistake; that person, seeing that, and not interfering to put the party upon his guard. The case with reference to that proposition, as ordinarily stated, is that of building upon another man's ground. That is a case, which supposes a total absence of title on the one side, implying, therefore, that the act must be done of necessity under the influence of mistake; and undoubtedly it may be expected, that the party should advertise the other, that he is acting under a mistake." The learned judge is clearly right in this view of the doctrine; and the duty of compensation in such cases, at least, to the extent of the permanent increase of value is founded upon the constructive fraud, or gross negligence, or delusive confidence held out by the owner; for under such circumstances the maxim applies: "Qui tacet, consentire videtur; qui potest, et debet vetare, jubet, si non vetat." See 1 Story, Eq. Jur. §§ 388–391; Green v. Biddle, 8 Wheat. [21 U. S.] 1, 77, 78; 1 Madd. Ch. Pr. 209, 210. Whether this doctrine is applicable to minors, who stand by, and make no objection, and disclose no adverse title, having a reasonable discretion from their age to understand, and to act upon the subject; and whether, if under guardianship, the guardian would be bound to disclose the title of his ward; and how far the latter would be bound by the silence or negligence of his guardian; and whether there is any just distinction between minors, living within the state, and minors, living without the state; these are questions of no inconsiderable delicacy and importance, upon which I should not incline to pass any absolute opinion in the present state of the cause, reserving them for further consideration, when all the facts shall appear upon the report of the master. There are certainly cases, in which infants themselves will be held responsible in courts of equity for their fraudulent concealments and misrepresentations, whereby other innocent persons are injured. See 1 Story, Eq. Jur. § 385; 1 Fonbl. Eq. Jur. bk. 1, c. 3, § 4; Savage v. Foster, 9 Mod. 35.

The other question, as to the right of the purchaser, bona fide and for a valuable consideration, to compensation for permanent improvements made upon the estate, which have greatly enhanced its value, under a title, which turns out defective, he having no notice of the defect, is one, upon which, looking to the authorities, I should be inclined to pause. Upon the general principles of courts of equity, acting ex aequo et

bono, I own, that there does not seem to me any just ground to doubt, that compensation, under such circumstances, ought to be allowed to the full amount of the enhanced value, upon the maxim of the common law, "nemo debet locupletari ex alterius incommodo;" or, as it is still more exactly expressed in the Digest, "jure naturae aequum est, neminem cum alterius detrimento et injuria fieri locupletiorem." Dig. lib. 50, lit. 17, 1. 206. I am aware, that the doctrine has not as yet been carried to such an extent in our courts of equity. In cases, where the true owner of an estate, after a recovery thereof at law, from a bona fide possessor for a valuable consideration without notice, seeks an account in equity, as plaintiff, against such possessor, for the rents and profits, it is the constant habit of courts of equity to allow such possessor (as defendant) to deduct therefrom the full amount of all the meliorations and improvements, which he has beneficially made upon the estate; and thus to recoup them from the rents and profits. 2 Story, Eq. Jur. §§ 799a, 799b, 1237–1239; Green v. Biddle, 8 Wheat. [21 U. S.] 77–81. So, if the true owner of an estate holds only an equitable title thereto, and seeks the aid of a court of equity to enforce that title, the court will administer that aid only upon the terms of making compensation to such bona fide possessor for the amount of his meliorations and improvements of the estate, beneficial to the true owner. See, also, 2 Story, Eq. Jur. § 799b, and note; Id. §§ 1237, 1238. In each of these cases the court acts upon an old and established maxim in its jurisprudence, that he who seeks equity, must do equity. Id. But it has been supposed, that courts of equity do not, and ought not to go further, and to grant active relief in favor of such a bona fide possessor, making permanent meliorations and improvements, by sustaining a bill, brought by him therefor, against the true owner, after he has recovered the premises at law. I find, that Mr. Chancellor Walworth, in Putnam v. Ritchie, 6 Paige, 390, 403–405, entertained this opinion, admitting at the same time, that he could find no case in England or America, where the point had been expressed or decided either way. Now, if there be no authority against the doctrine, I confess, that I should be most reluctant to be the first judge to lead to such a decision. It appears to me, speaking with all deference to other opinions, that the denial of all compensation to such a bona fide purchaser, in such a case, where he has manifestly added to the permanent value of an estate by his meliorations and improvements, without the slightest suspicion of any infirmity in his own title, is contrary to the first principles of equity. Take the case of a vacant lot in a city, where a bona fide purchaser builds a house thereon, enhancing the value of the estate to ten times the original value

of the land, under a title apparently perfect and complete; is it reasonable or just, that in such a case, the true owner should recover and possess the whole, without any compensation whatever to the bona fide purchaser? To me it seems manifestly unjust and inequitable, thus to appropriate to one man the property and money of another, who is in no default? The argument, I am aware, is, that the moment the house is built, it belongs to the owner of the land by mere operation of law; and that he may certainly possess and enjoy his own. But this is merely stating the technical rule of law, by which the true owner seeks to hold, what, in a just sense, he never had the slightest title to, that is, the house. It is not answering the objection; but merely and dryly stating, that the law so holds. But, then, admitting this to be so, does it not furnish a strong ground why equity should interpose, and grant relief?

I have ventured to suggest, that the claim of the bona fide purchaser, under such circumstances, is founded in equity. I think it founded in the highest equity; and in this view of the matter, I am supported by the positive dictates of the Roman law. The passage already cited, shows it to be founded in the clearest natural equity. "Jure naturae aequum est." And the Roman law treats the claim of the true owner, without making any compensation, under such circumstances, as a case of fraud or ill faith. "Certe" (say the Institutes) "illud constat; si in possessione constituto aedificatore, soli Dominus petat domum suam esse, me solvat pretium materiae et mercedes fabrorum; posse eum per exceptionem doli mali repelli; utique si bonae fidei possessor, qui aedificavit. Nam scienti, alienum solum esse, potest objici culpa, quod aedificaverit temere in eo solo, quod intelligebat alienum esse." Just. Inst. lib. 2, tit. 1, §§ 30, 32; 2 Story, Eq. Jur. § 799b; Vinn. Com. ad. Inst. lib. 2, tit, 1, § 30, notes 3, 4, pp. 194, 195. It is a grave mistake, sometimes made, that the Roman law merely confined its equity or remedial justice, on this subject, to a mere reduction from the amount of the rents and profits of the land. See Green v. Biddle, 8 Wheat. [21 U. S.] 79, 80. The general doctrine is fully expounded and supported in the Digest, where it is applied, not to all expenditures upon the estate, but to such expenditures only as have enhanced the value of the estate. ("quatenus pretiosior res facta est,") Dig. lib. 20, tit. 1, 1. 29, § 2; Id. lib. 6, tit. 1, 1. 65; Id. 1. 38; Pothier, Pand. lib. 6, tit. 1, notes 43–46, 48, and beyond what he has been reimbursed by the rents and profits. Dig. lib. 6, tit. 1, 1. 48. The like principle has been adopted into the law of the modern nations, which have derived their jurisprudence from the Roman law; and it is especially recognized in France, and enforced by Pothier, with his accustomed strong sense of equity, and general justice, and urgent

reasoning. Pothier, De la Propriete, notes 343–353; Civ. Code France, arts. 552, 555. Indeed, some jurists, and among them Cujacius, insist, contrary to the Roman law, that even a mala fide possessor ought to have an allowance of all expenses, which have enhanced the value of the estate, so far as the increased value exists. Pothier, De la Propriete, note 350; Vinn. ad. Inst. lib. 2, tit. 1, 1. 30, note 4, p. 195. The law of Scotland has allowed the like recompense to bona fide possessors, making valuable and permanent improvements; and some of the jurists of that country have extended the benefit to mala fide possessors to a limited extent. Bell, Comm. p. 139, § 538; Ersk. Inst. b. 3, tit. 1, § 11. 1 Stair, Inst. b. 1, tit. 8, § 6. The law of Spain affords the like protection and recompense to bona fide possessors, as founded in natural justice and equity. 1 Moreau & C. b..3, tit. 28, 1. 41, pp. 357, 358; Asa & Manuel, Inst. Laws Spain, 102. Grotius, Puffendorf, and Rutherforth, all affirm the same doctrine, as founded in the truest principles ex aequo et bono. Grotius, b. 2, c. 10, §§ 1–3; Puff. Laws Nat. b. 4, c. 7, § 61; Ruth. Inst. b. 1, c. 9, § 4, p. 7.

There is still another broad principle of the Roman law, which is applicable to the present case. It is, that where a bona fide possessor or purchaser of real estate pays money to discharge any existing incumbrance or charge upon the estate, having no notice of any infirmity in his title, he is entitled to be repaid the amount of such payment by the true owner, seeking to recover the estate from him. Dig. lib. 6, tit. 1, 1. 65; Pothier, Pand. lib. 6, tit. 1, note 43; Pothier, De la Propriete, note 343. Now, in the present case, it cannot be overlooked, that the lands of the testator, now in controversy, were sold for the payment of his just debts, under the authority of law, although the authority was not regularly executed by the administrator in his mode of sale, by a non-compliance with one of the prerequisites. It was not, therefore, in a just sense, a tortious sale; and the proceeds thereof, paid by the purchaser, have gone to discharge the debts of the testator, and so far the lands in the hands of the defendant (Boyd) have been relieved from a charge, to which they were liable by law. So, that he is now enjoying the lands, free from a charge, which in conscience and equity, he and he only, and not the purchaser, ought to bear. To the extent of the charge, from which he has been thus relieved by the purchaser, it seems to me, that the plaintiff, claiming under the purchaser, is entitled to reimbursement, in order to avoid a circuity of action, to get back the money from the administrator, and thus subject the lands to a new sale, or, at least, in his favor, in equity to the old charge. I confess myself to be unwilling to resort to such a circuity, in order to do justice, where upon the principles of equity the merits of the case can be reached by affect-ing the lands directly with a charge, to which they are ex aequo et bono, in the hands of the present defendant, clearly liable.

These considerations have been suggested, because they greatly weigh in my own mind, after repeated deliberations on the subject. They, however, will remain open for consideration upon the report of the master, and do not positively require to be decided, until all the equities between the parties are brought by his report fully before the court. At present it is ordered to be referred to the master to take an account of the enhanced value of the premises, by the meliorations and improvements of the plaintiff, and those, under whom he claims, after deducting all the rents and profits received by the plaintiff, and those, under whom he claims; and all other matters will be reserved for the consideration of the court upon the coming in of his report.

[NOTE. For the report of the master and final decree herein, see Case No. 1,876.]